UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| ROSE ANN DAVIDSON | : |
| as Administratrix of the Estate of | : |
| BRANDEN LOORI, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| PRIMECARE MEDICAL OF NEW YORK, INC., | : |
| PRIMECARE MEDICAL, INC., COUNTY OF | : |
| BROOME, SCOTLYNNE RIEDER, | : |
| ROBIN BOERST, JEN MROZ, | : |
| JAMIE POTTER, NAOMI BRIGNOLLE, and | : |
| MAHMOOD AHMEED, | : |
|  | : |
| Defendants. | : |

_____:

**COMPLAINT**

Civil Action No.: 3:24-cv-1522 (GTS/MJK)


**JURY TRIAL DEMANDED**

Plaintiff Rose Ann Davidson, as Administratrix of the Estate of Branden Loori, through counsel, hereby complains and alleges regarding the Defendants' conduct as follows:


**JURISDICTION**

1.     This Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1341, 1343 because it is filed to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States secured by the Constitution and Federal law pursuant to 42 U.S.C. § 1983.

2.     This Court also has supplemental jurisdiction over claims asserted in this action under New York State law pursuant to 28 U.S.C. § 1367.

1

3.      Plaintiff Rose Ann Davidson was the mother of the decedent Branden Loori. Plaintiff obtained Limited Letters of Administration on Behalf of the Estate of Branden Loori on November 6, 2024.  A copy of these limited letters is attached to this complaint as Exhibit A.

4.      The state law claims asserted by the Plaintiff include a claim for medical malpractice under New York state law.  A Certificate of Merit, as required under N.Y. C.P.L.R. § 3012-a, is attached hereto as Exhibit B.

5.      Venue is proper under 28 U.S.C. § 1391 (e)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district.


## **PARTIES**

6.      Plaintiff Rose Ann Davidson is a citizen of the United States and currently resides in Delaware County. Plaintiff is the Administratrix of the Estate of Branden Loori.  Decedent Branden Loori died on June  13, 2022 in Broome County, New York.

7.      Defendant PrimeCare Medical of New York, Inc. is a corporation duly licensed to conduct business in the State of New York, with its principal place of business being 3940 Locust Lane, Harrisburg, PA  17109.

8.      Defendant PrimeCare Medical, Inc. is a corporation duly licensed to conduct business in the State of Pennsylvania, with its principal place of business being 3940 Locust Lane, Harrisburg, PA  17109.  Upon information and belief, PrimeCare Medical of New York is a wholly owned subsidiary of PrimeCare Medical, Inc.  This belief is based on the fact that Thomas Weber is listed as the Chief Executive Officer of PrimeCare Medical of New York in the corporate disclosure filed with the New York Secretary of State, with an executive office at the same address

2

as PrimeCare Medical Inc., namely, 3940 Locust Lane, Harrisburg, PA 17109. Thomas Weber also serves as the Chief Executive Officer of PrimeCare Medical, Inc.

9. Defendant County of Broome is a municipal government duly incorporated under the laws of the State of New York, with its principal place of business being 60 Hawley Street, Binghamton, NY 13901.

10. At all times relevant herein, and upon information and belief, Defendant Scotlynne Rieder was employed by PrimeCare Medical of New York as a Physician's Assistant at the Broome County Jail, with her principal place of business being 155 Lt. Van Winkle Drive, Binghamton, NY 13905. It appears, given her residence in Pennsylvania, that Defendant Rieder was also an employee of PrimeCare Medical, Inc.

11. At all times relevant herein, and upon information and belief, Defendant Robin Boerst was employed by PrimeCare Medical of New York as a Registered Nurse at the Broome County Jail, with his or her principal place of business being 155 Lt. Van Winkle Drive, Binghamton, NY 13905.

12. At all times relevant herein, and upon information and belief, Defendant Jen Mroz was employed by PrimeCare Medical of New York as a Physician's Assistant. Upon information and belief, Defendant Mroz was employed at PrimeCare Medical's headquarters in Pennsylvania, given her residence in Harrisburg, Pennsylvania. Upon information and belief, Defendant Mroz's principal place of business is 3940 Locust Lane, Harrisburg, PA 17109.

13. At all times relevant herein, and upon information and belief, Defendant Jaime Potter was employed by PrimeCare Medical of New York as a Registered Nurse at the Broome County Jail, with his or her principal place of business being 155 Lt. Van Winkle Drive, Binghamton, NY 13905.

14.     At all times relevant herein, and upon information and belief, Defendant Naomi Brignolle was employed by PrimeCare Medical of New York as a Registered Nurse at the Broome County Jail, with her principal place of business being 155 Lt. Van Winkle Drive, Binghamton, NY 13905.

15.     At all times relevant herein, and upon information and belief, Defendant Mahmood Ahmeed was employed by PrimeCare Medical of New York as a Physician at the Broome County Jail, with his principal place of business being 155 Lt. Van Winkle Drive, Binghampton, NY 13905.

## FACTS

16.     Decedent Branden Loori was admitted into the custody of the Broome County Sheriff's Department on May 18, 2022. Less than a month after his admission, Mr. Loori died on June 13, 2022 after suffering from infective endocarditis.

17.     Branden Loori was admitted to the Broome County Jail after being arrested for a probation violation.  Given that that probation violation had not been adjudicated, Branden Loori was a pre-trial detainee entitled to the due process protections of the Fourteenth Amendment to the United States Constitution.

18.     Branden Loori's death was the subject of a highly critical Final Report from the New York State Commission of Correction that concluded, in part, "that had Loori been properly assessed and timely transferred to a hospital for diagnosis and treatment, his death may have been prevented."   A copy of the Commission of Correction's Final Report is attached hereto as Exhibit C.

19.     Since his admission to the Broome County Jail on May 18, 2022, Branden Loori consistently complained of having severe chest pain to several providers and nurses at the Broome County Jail.  Mr. Loori also advised a mid-level provider (Defendant Scottlynn Rieder) that his sister had recently died of endocarditis.  As is clear from his vital signs and the medical records, Mr. Loori's condition deteriorated for several days until he was hospitalized on May 23, 2022 after seeing a Medical Doctor … for the first time in five days as his condition continued to deteriorate.

20.     On May 18, 2022, Branden Loori was evaluated on intake by Nurse Sean Curley. After Loori detailed suffering from severe chest pain, was sweating excessively and had a low grade fever, he was referred by Nurse Curley to the Broome County Jail Medical Unit for a "cardiac evaluation."

21.     Upon information and belief, the Broome County Jail has an EKG machine in the medical unit.  Performing an EKG on a patient takes approximately 10 minutes, and involves minimal cost.

22.     The so-called "cardiac evaluation" was performed be Defendant Scotlynne Rieder, a Physician's Assistant.  During the course of her evaluation of Branden Loori, Defendant Rieder was informed that Branden Loori's sister, Stephanie Loori, had died three weeks earlier from the complications of endocarditis.  Loori further stated to Defendant Rieder that he was also an IV drug user.  Defendant Rieder did not recall if she made an inquiry about whether or not Branden Loori had used drugs with his sister, but intravenous drug use is an important risk factor for endocarditis.  Regardless, Branden Loori showed several classic signs of endocarditis, as detailed in his medical records from May 18, 2022, including low grade fever, diaphoresis, chest pain, increased chest pain while lying flat, pain during respiration that increased with breathing, and shortness of breath.  Loori also had an unresolved wound on his left hand that was either infected,

5

or showed signs of a prior infection.  In response to these symptoms, and her knowledge of Loori's potential exposure to endocarditis, Defendant Rieder did no meaningful cardiac evaluation, or any appropriate medical evaluation; she did not even conduct an EKG or direct that bloodwork be done.  Instead, Rieder attributed Loori's symptoms to anxiety with no effort to conduct a differential diagnosis, and sent him on his way.

23.     Defendant Rieder's evaluation of Branden Loori was grossly deficient and reckless. A patient with Branden Loori's presentation, including chest pain that worsened with breathing, required an immediate evaluation in a hospital, especially when combined with Loori's admission of intravenous drug use and the death of his sister from endocarditis just three weeks earlier— something that demonstrated a possible, if not likely, exposure to the bacteria that causes endocarditis.  It was reckless and deliberately indifferent of Defendant Rieder to dismiss and ignore Loori's symptoms as being related to "anxiety" over his legal situation and the death of his sister, versus actually having Loori evaluated in a hospital for the clear signs of cardiac distress.  The Commission of Correction's Final Report supports this conclusion, as Loori's presentation at the time Rieder evaluated him "exhibited clear signs of an acute illness, consistent with a possible PE and/or acute coronary syndrome and [Loori] should have been immediately sent to the hospital for an evaluation at that time."

24.     Defendant Rieder's notation in the medical record also states that Loori was to be monitored for worsening signs and symptoms.  No such monitoring occurred, for reasons that have not been explained.  There are no consistent records regarding Loori's vital signs, no effort to obtain blood work or imaging for Loori, and no effort to have Loori evaluated by a physician prior to his last day at the Broome County Jail.  Loori continued to experience chest pain, difficulty breathing and a low grade fever during the days that followed, in addition to multiple instances of

6

tachycardia and later a significant reduction in blood pressure. Regardless, Loori was still not evaluated by a physician for several days.

25.    On May 19, 2022, Defendant Jamie Potter evaluated Branden Loori in the Broome County Jail Medical Unit. At that time, Loori complained about having chest pain, on a scale of ten out of ten, and asking for topical pain medication. Despite an entry in the medical records from a day prior, where Loori detailed likely exposure to endocarditis, severe chest pain and shortness of breath, Defendant Potter failed to perform an appropriate nursing assessment on him, failed to address the source of his complaints of pain, and, most importantly, failed to have him evaluated by a physician. It is self-evident that a person complaining of severe chest pain needs to be evaluated by a physician or other medical provider, as severe chest pain is indicative of a range of life-threatening conditions, including endocarditis. The Commission of Correction detailed that Defendant Jaime Potter failed "to address Loori's unresolved complaints of acute 10 on 10 back pain and failed to consult with the jail physician."

26.    Defendant Potter's conduct in failing to properly evaluate Loori, and refer him to a physician, was grossly deficient and reckless.

27.    Starting on May 19, 2022, Defendant Robin Boerst had a multitude of interactions with Branden Loori, and witnessed Mr. Loori's deteriorating condition over time. Upon information and belief, Nurse Boerst was the nurse normally on duty during the overnight hours in the Broome County Jail.

28.    On May 19, 2022, Boerst had two interactions with Branden Loori, where his temperature, pulse, oxygen saturation and respirations were allegedly normal. Loori did, however, complain to Defendant Boerst about back and neck pain.

29.    On May 20, 2022, Boerst was called to Loori's housing unit to speak with him. Boerst observed Loori lying on a concrete floor, and complaining against about pain in his shoulder—pain so severe that he was not able to sleep for three hours.  Boerst did not even bother to check Loori's vital signs or do any appropriate nursing assessment, nor did she place him on the physician's call list for the following day.  Instead, she basically did nothing.  Relative to this particular evening, the Commission of Correction determined that "a complete medical assessment was not appropriately performed on Loori's complaints of right shoulder pain that had [disrupted] his sleep for three hours nor was Loori referred to the jail's physician for the continued complaints."

30.    The following day, Boerst did not evaluate Loori, instead claiming he refused treatment.

31.    On May 22, 2022, Loori's condition began to deteriorate substantially.  Boerst twice took Mr. Loori's pulse, which was 122, representing tachycardia.  Loori's also had a fever, at a temperature of 100.5 degrees, and his blood pressure had dropped substantially, from a normal of approximately 128/80 to 86/51.  Loori also detailed, again, having pain in the center of his chest that radiated to his back and shoulder, and further had inspiratory wheezes in all lung fields that were louder at the bases.  Loori also, according to Boerst, did not "look well." While fever, tachycardia and chest pain were clear signs of endocarditis, the precipitous drop in blood pressure was the most alarming.  Individuals with endocarditis and associated damage to the heart valves often times have a substantial reduction in blood pressure due to poor output or flow from the heart.

32.    Defendant Boerst had Branden Loori brought to the medical unit for closer observation – despite not having provided any additional observation as the evening progressed.

She also administered an EKG on Mr. Loori.  This EKG demonstrated that Loori, who had no history of cardiac disease, suffered from "sinus tachycardia with occasional ventricular complexes."  The EKG further detailed that Loori's heart suffered from an abnormal rhythm.  This EKG result, combined with Loori's other symptomology, mandated an immediate evaluation in a hospital by a physician.  Instead, Boerst claimed that she was "on the fence" about sending him to the hospital, and instead, allegedly, called the PrimeCare Medical and spoke with an on-call provider, Defendant PA Jen Mroz, about Loori's situation.  Following this alleged call with Defendant Mroz, Defendant Boerst did nothing more.  She did not assess Loori again during the evening or following morning, or check on him in any way.  Instead, she allegedly informed the nurse coming on in the morning, who was, upon information and belief, Defendant Naomi Brignolle, to check Loori's vitals.  Defendant Boerst did not check Mr. Loori's vitals again herself, nor did she follow PA Mroz's direction that Loori be seen by a medical provider first thing in the morning.  These alleged instructions to her successor nurse also were not documented in the medical record.  The Plaintiff maintains that Defendant Boerst, when confronted with a gravely ill man who showed the obvious signs of endocarditis, and, more importantly, **clearly** needed to be evaluated by a physician, basically did nothing after – maybe – phoning it in to the on-call provider at PrimeCare Medical.

33.     The Commission of Correction was highly critical of Defendant Boerst's conduct. The Commission of Correction concluded that "there was a complete failure by the medical staff to properly assess and provide treatment for a gravely ill individual.  The Medical Review Board finds that R.N. [Boerst] should have had Loori, who had hallmark signs of a worsening condition since his admission with a temperature of 100.5, a pulse of 122, respirations of 20, a blood pressure of 86/51, an oxygen saturation of 95%, with pain that radiated from his back to his right shoulder,

**transported immediately to the hospital for an evaluation at that time.**  The Medical Review Board also finds that R.N. [Boerst] should have minimally gone back and assessed Loori again throughout her shift and obtained another set of vital signs instead of telling the next shift nurse to check on Loori and to get a set of vital signs on him."

34.    There is an important adage in corrections nursing:  When in doubt, send them out. Nurse Boerst conduct toward Branden Loori was grossly deficient and reckless, and is a textbook example of deliberate indifference to the serious medical needs of a gravely ill man.  Boerst's conduct is so patently irresponsible that it shocks the conscious, and is deserving of an award of punitive damages.

35.    Defendant Physician's Assistant Jen Mroz was similarly reckless in addressing Loori's condition.  In her statements to the Commission of Correction, which are both recorded and reflected in the Commission of Correction Final Repot, Mroz admitted that she would have sent "a patient with [Loori's] vital signs and complaints" to the "emergency room."  Mroz admitted, however, that she had no recollection of receiving a phone call about Branden Loori, and made no record of her alleged telephone call about Branden Loori, or any telephone calls she received in her capacity as the on-call provider for PrimeCare Medical.  Upon information and belief, Defendant Mroz also did not have access to Branden Loori's medical record when taking a call from the Broome County Jail.

36.    The Plaintiff is, given this lack of medical documentation, left to make one of three assumptions about what occurred.  First, Defendant Boerst did not, in fact, call PA Mroz, and fabricated the medical record accordingly.  Second, Defendant Boerst called PA Mroz, but was not forthright and thorough in her discussions with Mroz about Loori's condition.  Both of these assumptions clearly support a finding of recklessness and deliberate indifference against Boerst.

Or third, Boerst called Mroz, thoroughly detailed Branden Loori's condition and medical history, and then Mroz recklessly failed to send Loori to the hospital when her medical training counseled that she should do so.  In that instance, both Boerst and Mroz were reckless, because Boerst should have sent Loori to the hospital in any event.

37.    Regardless, if Defendant Mroz was completely informed about Loori's condition, her failure to direct that Loori be evaluated in an emergency room was grossly deficient and reckless.

38.    Upon information and belief, Defendant RN Naomi Brignolle came on duty on the morning of May 23, 2022, and spoke to Defendant Boerst.  Despite being told of Loori's deteriorating medical condition (as detailed in the medical records), the need to immediately assess his vital signs, and the direction that Loori be evaluated by a medical provider first thing in the morning, Defendant Brignolle did nothing.  Defendant Brignolle only took Loori's vital signs at 1:10 PM, and did not endeavor to have him evaluated by a medical provider.

39.    Defendant Brignolle's conduct in failing to properly evaluate Loori, and immediately refer him to a physician, was grossly deficient and reckless.

40.    At 4:46 PM on May 23, 2022, Branden Loori was finally evaluated by a physician, Defendant Mahmood Ahmeed, who immediately directed that Loori be transported to a hospital "for an evaluation of chest pain and to rule out acute cardiac symptoms."  The Plaintiff notes that these complaints of chest pain had been made to several nurses and mid-level medical providers from the moment Loori arrived at the Broome County Jail, and where repeatedly reflected in Loori's medical records, yet no one bothered to appropriately evaluate him for these symptoms, much less send him to the hospital.

41.     While Defendant Ahmeed's medical record reflects that he only saw Branden Loori at 4:46 PM on May 23rd, the response of PrimeCare Medical of New York to the New York State Commission of Correction's Preliminary Report details that Defendant Ahmeed actually saw Branden Loori "that morning in the medical housing unit." That encounter is not reflected anywhere in the Decedent's medical records, nor is it reflected in Ahmeed's medical record from May 23, 2022. Assuming that PrimeCare Medical of New York's statement is true, the Plaintiff pleads an alternative claim against Defendant Ahmeed.

42.     On the morning of May 23, 2022, Defendant Ahmeed evaluated Branden Loori. Despite Loori's extensive medical history when housed in the Broome County Jail, as detailed above, Defendant Ahmeed apparently did not review Loori's medical history, nor the records generated from the evening before. Defendant Ahmeed did not even collect a set of vital signs from Mr. Loori, or make any effort, during that morning encounter, to conduct a proper medical assessment of him. His records do not reflect that he reviewed Loori's abnormal EKG, nor that he reviewed Loori's extensive symptomology. Any physician reviewing Loori's entire medical record would have known of the need for Loori to be immediately hospitalized. Instead of initially directing that Loori be hospitalized, which Loori's medical condition clearly required, Defendant Ahmeed waited over eight hours to do so.

43.     Defendant Ahmeed's conduct in failing to properly evaluate Loori, and immediately refer him to the emergency room, was grossly deficient and reckless.

44.     Endocarditis develops very quickly, and the number of bacteria attacking the heart usually multiplies at an exponential rate. Even a modest amount of delay in treatment can result in serious adverse consequences for a patient, including destruction or damage to the heart valve, septic emboli, bacterial infection spreading to other organs, or, as was the case here, death.

Branden Loori showed the hallmark symptoms of endocarditis throughout his tenure in the Broome County Jail, and his possible exposure to endocarditis and admitted IV drug use made his evaluation by an emergency room that much more pressing.  The response of the above-named Defendants was to do basically nothing as Loori's infection continued to grow until it threatened his life, as demonstrated by an abnormal EKG, elevated temperature, substantial reduction in blood pressure, tachycardic pulse, shortness of breath and continuing complaints of chest pain.  Even then, the Defendants failed to send him to the hospital … until it was effectively too late.

45.    The Plaintiff maintains that this parade of failures was motivated by one thing: money.  PrimeCare Medical of New York's profits stem from delaying and denying care to detainees, and this desire for profit manifests itself in a culture where the medical needs of detainees are ignored or minimized at all levels of the organization.  Here, these delays cost Branden Loori his life.

46.    The Commission of Correction agreed, and concluded its findings regarding Branden Loori's death by stating that the "Medical Review Board opines that there was an unacceptable delay of over 48 hours in obtaining hospital level care for Loori and his documented worsening condition.  Had Loori been timely sent to the hospital for diagnosis and treatment, his death could have been prevented."

47.    Upon information and belief, Defendant PrimeCare Medical has a contractual and agency relationship with UHS Wilson Memorial Hospital for the treatment of detainees at the Broome County Jail, including for the coordination and continuation of care.  Upon information and belief, this relationship included the sharing of electronic medical records, and common consultation between providers regarding the medical needs of detainees.  This relationship was demonstrated, in part, by providers and medical staff at Wilson Memorial Hospital providing

13

Branden Loori's medical information to physicians and staff members of PrimeCare Medical of New York at the Broome County Jail.

48.    Branden Loori arrived at Wilson Hospital on May 23, 2022, and was evaluated by an emergency room doctor at 6:44 PM.  Less than one hour later, at 7:26 PM, Branden Loori was administered cefepime and vancomycin (two strong antibiotics) based on his symptomology, which demonstrated a severe infection.  He was then properly diagnosed with endocarditis caused by Methicillin-Resistant Staphylococcus Aureus (MRSA), with Septic emboli.  His later diagnostic testing demonstrated septic eboli in the lungs, substantial bacterial growth on his tricuspid heart valve, and blood cultures consistent with MRSA infection.

49.    Three days later, Loori's medical condition deteriorated when he was diagnosed with progressive necrotizing pneumonia with acute hypoxemic respiratory failure, secondary to MRSA sepsis.  He was then intubated and transferred to the Wilson Hospital Intensive Care Unit on May 26, 2022.

50.    On June 13, 2022, Branden Loori was removed from life support, and he died shortly thereafter.

51.    Branden Loori died a preventable death, in that, had he been sent to the hospital earlier by PrimeCare Medical of New York, and its employees, he could have been properly treated and survived his infection.

52.    At some point prior to Branden Loori's incarceration, Broome County contracted with PrimeCare Medical of New York to provide medical care at the Broome County Jail.

53.    PrimeCare Medical, the parent company of PrimeCare Medical of New York, provides medical care at multiple local correctional facilities throughout the State of Pennsylvania.

54.    Upon information and belief, at least two of the Defendants here, Defendants Rieder and Mroz, are actually employees of PrimeCare Medical, not PrimeCare Medical of New York, in that both individuals have their professional address as the headquarters of PrimeCare Medical in Pennsylvania.

55.    The Corporate Defendants (PrimeCare Medical and PrimeCare Medical of New York) have demonstrated a pattern and practice of being deliberately indifferent to the serious medical needs of detainees under their care.  That pattern of deliberation starts with the business model of the Corporate Defendants, which provides strong and systemic disincentives for the provision of appropriate healthcare for detainees.  PrimeCare Medical and PrimeCare Medical of New York's contracts with county governments are "all in," capitation contracts, where the County government pays a set fee for health services at their local jail, regardless of the medical needs of the relevant detainees with the exception of catastrophic medical problems. As a result, all medical care provided to detainees comes directly out of the Defendants' profit margin. If a detainee requires expensive surgery or chemotherapy, especially where there is a possibility that a detainee could be released or incarcerated elsewhere in the near future, there is a direct financial incentive for the Defendants to delay or deny care to a detainee. There is also a powerful incentive to reduce labor costs, in the form of the number of, and qualifications of, nurses and medical staff.

56.    This profit motive, and/or a patent lack of supervision, has demonstrated itself in a pattern of deliberately indifferent behavior by PrimeCare Medical.  This pattern of deliberately indifferent conduct includes repeated failures by PrimeCare Medical to send severely ill individuals to the emergency room or outside physicians, repeated failure by PrimeCare Medical to otherwise provide adequate medical care to detainees under their supervision (including in the provision of medicines), failure to properly monitor detainees presenting signs of serious medical

conditions, repeated refusals to discipline or remedy the deficiencies of staff members who make medical errors or who are indifferent to the medical needs of detainees, persistent failures to provide appropriate levels of nursing and medical staffing, failure to hire experienced medical staff, failure to have appropriate written policies and procedures to address detainee health needs, hospitalization, and medical emergencies, failure to ensure that the written policies promulgated by PrimeCare were followed by its employees, failure to provide proper training for staff members to properly address detainee medical needs, including the need to conduct full nursing and/or medical assessments, failure to maintain adequate medical records, failure to require all providers involved in a detainees care to review prior medical records, *post hoc* alteration of medical records to conceal misconduct, and failure to conduct legitimate peer reviews or mortality reviews to avoid similar problems in the future.

57. This criticism is especially true regarding staffing levels. Upon information and belief, Broome County conducted an audit of the staffing levels provided by PrimeCare Medical of New York, and found substantial deficiencies in those staffing levels at or around the time of Branden Loori's death. Upon information and belief, Broome County and its taxpayers were, in fact, billed for services never provided by PrimeCare Medical of New York.

58. As detailed below, these failures by the Corporate Defendants have led to a plethora of Federal civil rights lawsuits alleging the same type of failures detailed in this case – the failure to conduct appropriate nursing and medical assessments, the failure of providers and nurses to review medical records, the failure to seek consultation or hospitalization for seriously ill detainees, and the failure to monitor detainees presenting with acute medical needs. These failures also demonstrate that the Corporate Defendants are deliberately indifferent to the serious medical needs of detainees under their care, based on the profit motives contained in their various contracts.

16

59.     PrimeCare Medical, the parent company of PrimeCare Medical of New York, has been successfully sued, repeatedly, in the State of Pennsylvania for violating the civil rights of several detainees in a similar manner to the violation of Branden Loori's civil rights.  Hundreds of lawsuits have been filed against PrimeCare Medical in the Federal courts of Pennsylvania alleging facts strikingly similar to those presented here, and making similar allegations regarding Prime care's practices and procedures.  Many of these lawsuits terminated with confidential settlements. Regardless, the worst of this parade of horribles is detailed below:

- Failure by PrimeCare Medical staff to properly treat an individual with a brain injury who was incarcerated in the Dauphin County, Pennsylvania jail after a traffic accident.  The individual in question showed the classic signs of a brain injury for several days before his death, but received nothing but cursory care and no appropriate medical testing.  The detainee died shortly after being admitted to the hospital.  *White v. Dauphin County, et. al,* No. 1:22-CV-1241 (M.D. Pa.)

- Wanton failure by PrimeCare Medical staff at the Centre County Jail in Pennsylvania to properly treat an individual with a spinal injury whose hardware had displaced, causing permanent paralysis and other problems for the detainee. PrimeCare staff failed to follow medical directions, required the detainee to move on his own in the face of obvious neurological problems, including to obtain items in his cell, and failed to provide him with his cervical collar.  The Federal court sustained policy claims against PrimeCare Medical where there was a failure to establish appropriate policies to address immediate, non-emergency medical needs of inmates with serious medical conditions.  *Rossman v. PrimeCare Medical, et. al.,* No. 21-CV-0703 (M.D. Pa.)

- Failure by PrimeCare Medical staff to promptly address the serious medical needs of a detainee who was obviously suicidal, who later committed suicide, and was later rendered permanently disabled from his injuries while housed at the Berks County Jail in Philadelphia. The Federal court determined where, as here, allegations are made of deficient staffing and dilatory medical evaluations contributing to a detainee's injuries, those allegations are sufficient to substantiate policy liability against PrimeCare Medical. *Kinney v. County of Berks, et. al,* No. 22-2566 (E.D. Pa.)

- Failure by PrimeCare Medical to monitor or provide medical treatment to a detainee who was suffering from severe withdrawal, including abnormal vital signs, tremors and nausea. The detainee later died from untreated withdrawal symptoms. *Harbaugh v. Bucks County, et. al.,* No. 20-1685 (E.D. Pa.)

- Persistent failure, over the course of several months, by PrimeCare Medical staff to appropriately diagnose or treat malignant melanoma on a detainee's shin. The melanoma ultimately metastasized to the detainee's lymph glands, resulting in a Stage Three cancer diagnosis. The detainee demonstrated to the Court a substantial delay in a medical evaluation of his shin, a failure to monitor the detainee's condition, and a failure to refer the detainee for further examination or referral to a specialist. The Federal court determined that PrimeCare Medical could be held liable for a failure of its medical staff to comply with written policies, and for providing untrained nurses. *Ravert v. Montgomery County,* No. 20-CV-889 (M.D. Pa.)

18

- Failure by PrimeCare Medical staff to provide a severely mentally ill detainee with her mental health medication, despite the medication being prescribed for the detainee and that detainee detailing to PrimeCare Medical staff that she needed to take that medication.  The detainee later successfully committed suicide.  Policy claims were substantiated against PrimeCare Medical based on a failure to train medical staff. *Redcliff v. Schuylkill County, et. al.,* No. 21-CV-1866 (M.D. Pa.)

- Prolonged failure by PrimeCare medical staff to monitor and assist a detainee with jaundice, including multiple instances where medical evaluation was required and never provided.  The detainee notified PrimeCare Medical staff that he suffered from hyperthyroidism.  The detainee later died from organ failure after a prolonged hospitalization.  The detainee's Estate's representative asserted a range of policy and procedure complaints against PrimeCare Medical, including a discussion of Prime care's contract incentives, with PrimeCare ultimately settling the action shortly after it was filed.  *Viney v. Montgomery County, et. al.,* No. 20-CV-0367 (E.D. Pa.)

- Persistent failures by PrimeCare Medical staff to address a detainee's suicidal ideation, including ignoring policies, failure to review medical records by medical staff, medical orders not followed, insufficient staffing (staffing levels were the subject of complaints from PrimeCare nurses), insufficient medical staff, and failing to provide prescribed medication.  Following the detainee's death, PrimeCare Medical was sued, and nearly 12 million dollars in damages were awarded to the detainee's family by a Federal jury.  The verdict, including 8 million dollars in punitive damages, was upheld on appeal after an appeals court determined

that PrimeCare Medical's actions were "outrageous." *Ponzini v. Monroe County, et. al.,* No. 11-CV-0413 (M.D. Pa.)

- Refusal by PrimeCare Medical to allow asthmatic detainees at the Lehigh County jail to have access to albuterol inhalers due to the rising cost of the inhalers, resulting in the predictable death of an asthmatic whose care was delayed when, instead of using a rescue inhaler, she had to wait to be moved to the medical unit for a nebulizer treatment. *Fargione v. Sweeney, et. al.,* No. 16-CV-5878 (E.D. Pa.)

60.     The Plaintiff can, provided with additional time and the provision of discovery, undoubtedly point the Court to scores of other instances where PrimeCare Medical has provided woefully insufficient care to detainees, and where that care directly stems from PrimeCare Medical's failure to have appropriate policies, sufficient medical staff, trained medical staff, and a willingness to provide appropriate medical care to detainees.

61.     Here, there are a range of policy failures from PrimeCare Medical that contributed to Branden Loori's death, in addition to the overarching profit incentives detailed earlier.

62.     First, the Corporate Defendants failed to have any policies in place to address the medical needs of individuals who enter the facility who are admitted IV drug users. Endocarditis is one of many blood borne illnesses that are known to be associated with individuals who are IV drug users, and special vigilance is needed when addressing the medical needs of these individuals. This is especially true when individuals acknowledge exposure to endocarditis prior to arriving at a correctional facility.  The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

63.     The Corporate Defendants failed to have a policy and procedure in place to address the specific medical requirements after medical monitoring is directed by a medical provider.

20

Here, there was no order sheet provided by Defendant Rieder detailing under what circumstances Branden Loori should be monitored, including the frequency of observation, the type of vital signs to be taken (e.g. blood pressure, temperature) and at what intervals, and when nursing staff should consult a physician. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

64.    The Corporate Defendants failed to provide sufficient levels of staffing at the Broome County Jail, including sufficient physician coverage, at the time of Branden Loori's death.

65.    The Corporate Defendants failed to have a policy in place requiring medical staff to thoroughly review a patient's medical chart before providing care. Multiple employees of PrimeCare Medical admitted that they failed to review Branden Loori's medical history when providing him with care, which would have alerted them to the possibility of his exposure to endocarditis. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

66.    The Corporate Defendants failed to have a policy providing electronic medical records access to on call medical providers, and a policy requiring those providers to thoroughly review a detainee's medical history prior to providing direction to nurses at local jails about detainee medical needs. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

67.    The Corporate Defendants failed to have a policy requiring nurses to fully communicate all of a detainee's symptoms when calling on call medical providers, including a full disclosure of a detainee's medical history. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

68.     The Corporate Defendants had a policy of failing to provide adequate medical staff at the Broome County Jail, including at levels required by their contract with Broome County, including adequate levels of both nurses and physicians.

69.     The Corporate Defendants had a policy of failing to provide properly trained and/or experienced nurses at the Broome County Jail.

70.     The Corporate Defendants had a policy or informal practice of not requiring physicians, providers and nurses to compile complete and accurate medical records about patient encounters.  The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

71.     The Corporate Defendants had a policy or informal practice of not requiring their physicians, providers and nurses to conduct a full assessment of detainee medical problems according to professional standards, including requiring imaging and blood testing where appropriate.  The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

72.     The Corporate Defendants failed to have a policy providing guidance to nurses or other medical staff about when to send detainees to the hospital.  The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

73.     The Corporate Defendants failed to have a policy providing guidance to nurses and other medical staff about how to address sudden changes in vital signs, and how to address abnormal EKG results.  The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

74.     The Corporate Defendants failed to have a policy providing requirements for the parameters of a cardiac evaluation, and how to address a detainee's complaints of chest pain, both

at one instance and complaints over time. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

75.     The Corporate Defendants failed to have a policy providing guidance on how to address a detainee's complaints of shortness of breath and difficulty breathing, both at one instance and complaints over time. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

76.     The Corporate Defendants failed to have a policy providing guidance about when a detainee's medical condition becomes serious enough to warrant being seen by a physician. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

77.     The Corporate Defendants failed to have a policy detailing that any individual admitted to the Broome County Jail medical observation unit should be seen by a physician as soon as possible for an appropriate medical evaluation. The Corporate Defendants also failed to have an appropriate training regimen to address these issues.

78.     In the alternative, the Corporate Defendants had appropriate policies on some or all of these subjects, but failed to properly enforce them or provide appropriate supervision to their employees when they failed to follow them.

79.     All of these policy and supervision failures directly contributed to Branden Loori's death.

80.     Defendant Broome County was well aware of the failings of the Corporate Defendants when contracting with PrimeCare Medical of New York to provide healthcare at the Broome County Jail. Upon information and belief, PrimeCare Medical must provide the County with a litigation history when bidding on a public contract. Furthermore, a simple google search on PrimeCare Medical provides multiple news articles addressing the company's failings and

extensive history of being sued for providing insufficient care to detainees.  This failure is compounded by the fact that Broome County previously employed Correctional Medical Care/CBH Medical at their county jail, companies who utilized a similar contractual structure, and whose conduct led to multiple inmate deaths at the Broome County Jail, including Saladin Barton and Alvin Rios.  Broome County cannot outsource its constitutionally mandated obligations to provide health care at the Broome County Jail.  The County is equally responsible for the deliberately indifferent care provided at the Broome County Jail, especially given its failure to enforce its own contract requirements against PrimeCare Medical of New York.

81.    During all times mentioned in this Complaint, the Defendants were acting under color of state law, that is, under color of the Constitution, statutes, laws, charter, ordinances, rules, regulations, customs, and usages of the State of New York, Broome County, PrimeCare Medical, and PrimeCare Medical of New York.

82.    PrimeCare Medical, PrimeCare Medical of New York and their employees were also operating under color of state law, in that these defendants are performing a function traditionally reserved for state and/or municipal agencies, and as such are equally responsible for the violation of civil rights as if they were state actors.

83.    The Defendants, at all times mentioned in the Complaint, either knew or should have known that their actions violated clearly established law protecting the Constitutional and statutory rights of the decedent.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

#### Violation of Constitutional Rights under Color of State Law
#### -- Deliberate Indifference to Serious Medical Needs—

84.    Plaintiff incorporates by reference and realleges each and every allegation stated herein.

85.    The Fourteenth Amendment to the United States Constitution guarantees all citizens the right to due process of law.  In that regard, the Fourteenth Amendment precludes jail officials from being deliberately indifferent to the medical needs of detainees in their care.  A municipal official acts with deliberate indifference when a detainee suffers from a serious medical need, and that official acts or fails to act to mitigate the condition when they knew, or should have known, that the condition posed a substantial risk to the health of the detainee.

86.    The actions of the Defendants detailed above violated Branden Loori's rights under the United States Constitution. In short, it was not objectively reasonable for the Defendants to ignore the decedent's serious medical problems, including his persistent chest pain, difficulty breathing, fever, tachycardia, abnormal EKG readings, declining blood pressure, past IV drug use, and possible exposure to endocarditis.  In fact, the Defendants' actions demonstrate a deliberate indifference to the decedent's serious medical needs under the Fourteenth Amendment.

87.    All of the individual Defendants were acting in their capacity either as medical staff of PrimeCare Medical and/or PrimeCare Medical of New York, companies contracted to provide constitutionally mandated medical treatment at the Broome County Jail, and were therefore are acting under color of state law. As such their actions and inactions also represent a violation of 42 U.S.C. § 1983.

88.     Broome County is directly responsible for the actions of PrimeCare Medical and PrimeCare Medical of New York and their employees, as the County cannot delegate its constitutionally mandated responsibilities to provide adequate healthcare to jail detainees.

89.     Defendants' actions were motivated by malice and/or are grossly negligent.

90.     As a direct and proximate result of the unconstitutional acts described above, Branden Loori was irreparably injured when he died. The Plaintiff expressly seeks damages for decedent's loss of life.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST PRIMECARE MEDICAL, PRIMECARE MEDICAL OF NEW YORK AND BROOME COUNTY

### --Implementation of Municipal Policies and Practices that Directly Violate Constitutional Rights/ Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and/or Failure to Train and Supervise Employees under Color of State Law--

91.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

92.     The Fourteenth Amendment to the United States Constitution guarantees all citizens the right to due process of law.  In that regard, the Fourteenth Amendment precludes jail officials from being deliberately indifferent to the medical needs of detainees in their care.  A municipal official acts with deliberate indifference when a detainee suffers from a serious medical need, and that official acts or fails to act to mitigate the condition when they knew, or should have known, that the condition posed a substantial risk to the health of the detainee.

93.     Upon information and belief, PrimeCare Medical and PrimeCare Medical of New York, through express policy, practices or the inactions of its policy makers, had a policy and/or practice of not providing appropriate medical care to detainees at the Broome County Jail,  or

appropriate medical care at any of the facilities they oversaw.  These failures are especially pronounced here, as the range of failures detailed in this complaint could have easily been addressed by having appropriate policies and procedures in place to address the predictable medical problems suffered by Branden Loori.  In the alternative, they could have been addressed by properly training and supervising medical staff at the Broome County Jail.

94.    Broome County is directly responsible for the actions of PrimeCare Medical and PrimeCare Medical of New York and their employees, as the County cannot delegate its constitutionally mandated responsibilities to provide adequate healthcare to jail detainees.

95.    Furthermore, Broome County is also responsible for this constitutional violation by virtue of its own actions, in failing to enforce the terms of its contract with the Corporate Defendants, including requiring appropriate staffing levels at the Broome County Jail.

96.    As a direct and proximate result of the unconstitutional acts described above, Branden Loori was irreparably injured when he died. The Plaintiff expressly seeks damages for decedent's loss of life.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST PRIMECARE MEDICAL AND PRIMECARE MEDICAL OF NEW YORK**

**Violation of State Law**
**--Medical Negligence--**

97.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

98.     The actions of the Defendants detailed above detailed above represent a claim for medical negligence under the laws of the State of New York. Specifically, the medical care provided to Branden Loori by the above-named Defendants was clearly negligent; in fact, it was grossly so.

99.     The above-named Defendants are both vicariously liable for the actions and inactions of their employees, as detailed above, but are also liable for the entire course of care provided to Branden Loori, which was also grossly negligent.

100.     As a direct and proximate result of the illegal acts described above, Branden Loori was irreparably injured when he died.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST PRIMECARE MEDICAL AND PRIMECARE MEDICAL OF NEW YORK

### Violation of State Law
### -- Negligence --

101.    Plaintiff incorporates by reference and realleges each and every allegation stated herein.

102.    The actions of the Defendants detailed above detailed above represent a claim for negligence under the laws of the State of New York. Specifically, even removing a consideration of the exercise of medical judgment in the care provided to Branden Loori, the various policy failures, and the lack of training, detailed in this complaint are clearly negligent; in fact, these failures are grossly negligent.  For instance, no responsible medical provider fails to have:  Policies addressing foreseeable medical issues; Policies addressing the compilation of medical records; Policies allowing providers to have access to medical records when off site; Policies requiring medical staff to review medical records and medical history before providing care; Policies detailing the requirements for medical monitoring; Policies detailing requirements for hospitalization; Policies detailing the requirements for appropriate nursing and medical assessments; Policies addressing the provision of appropriate training to medical staff; Policies detailing the provision of adequate medical staff, providers and physicians in an institutional setting; Policies requiring the provision of experienced medical staff; and Policies detailing the requirement of providing a full medical history when seeking guidance from medical providers, amongst other issues.

103.    As a direct and proximate result of the illegal acts described above, Branden Loori was irreparably injured when he died.

## DEMAND FOR PUNITIVE DAMAGES

104.    The actions and inactions of all Defendants (with the exception of Broome County) detailed above, especially when considering the pattern of misconduct by the Corporate Defendants in causing the deaths of scores of detainees, are extreme and outrageous, and deserving of an award of punitive damages.  The Plaintiff does not seek punitive damages against the County of Broome.

## DEMAND FOR TRIAL BY JURY

105.    The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Rose Davidson, on behalf of the Estate of Branden Loori, requests that this Honorable Court grant her the following relief:

A.    A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B.    A judgment in favor of Plaintiff against all Defendants, with the exception of Broome County, for punitive damages in an amount to be determined by a properly charged jury;

C.    A monetary award for attorney's fees and the costs of this action, pursuant to 42 U.S.C. § 1988;

D.    Any other relief that this Court finds to be just, proper and equitable.

Respectfully Submitted By:

/s Elmer Robert Keach, III

Dated: December 13, 2024

Elmer Robert Keach, III, Esquire
One Pine West Plaza, Suite 120
Albany, NY  12205
Telephone: 518.434.1718
Telecopier: 518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com

**ATTORNEY FOR PLAINTIFF**

31

# E   HIBIT A

*On the Date Written Below LETTERS are Granted by the Surrogate's Court, State of New York as follows:*

**File #: 2024-635**

Name of Decedent:     **Branden Loori**                                     Date of Death: **June 13, 2022**

Domicile of Decedent:  **County Of Broome**

Fiduciary Appointed:   **Rose Ann Davidson**
Mailing Address

Deposit NY 13754

Letters Issued:        **LETTERS OF ADMINISTRATION WITH LIMITATIONS**

Limitations:           **Pursuant to SCPA 702, and EPTL 5-4.6 and Uniform Rules for Surrogate's Court 207.38, no final compromise of any wrongful death or related action(s) or proceeding(s) shall be made, nor any attorney's fees taken relating to the wrongful death action, without prior application to the Surrogate for leave to compromise said action(s) or proceeding(s) and obtaining an Order from the Surrogate approving said compromise and distribution of proceeds, if any.**

THESE LETTERS, granted pursuant to a decree entered by the court, authorize and empower the above-named fiduciary or fiduciaries to perform all acts requisite to the proper administration and disposition of the estate/trust of the Decedent in accordance with the decree and the laws of New York State, subject to the limitations and restrictions, if any, as set forth above.

**Dated: November 6, 2024**                      IN TESTIMONY WHEREOF,    the seal of the
                                                 Broome County Surrogate's Court has been affixed.

                                                 WITNESS, Hon David H Guy, Judge of the Broome
                                                 County Surrogate's Court.

                                                 *Rebecca A. Malmquist*

                                                 Rebecca A Malmquist, Chief Clerk

*These Letters are Not Valid Without the Raised Seal of the Broome County Surrogate's Court*

**Attorney:**
**Elmer Robert Keach**
**Law Offices Of Elmer Robert Keach III PC**
1 Pine West Plz Suite 109
Albany NY 12205

E   HIBIT B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| ROSE ANN DAVIDSON<br>as Administratrix of the Estate<br>of BRANDEN LOORI,<br><br>      Plaintiff,<br><br>   v.<br><br>PRIMECARE MEDICAL OF NEW YORK, INC.,<br>PRIMECARE MEDICAL, INC.,  COUNTY OF<br>BROOME, SCOTLYNNE RIEDER,<br>ROBIN BOERST, JEN MROZ,<br>JAMIE POTTER, NAOMI BRIGNOLLE, and<br>MAHMOOD AHMEED,<br><br>      Defendants. | Civil Action No.: |

---

**CERTIFICATE OF MERIT**

Elmer Robert Keach, III, Attorney for Plaintiff, declares that:  I have reviewed the facts and medical records of the foregoing case with a physician who is licensed to practice medicine in, at a minimum, the State of New York pursuant to the provisions of N.Y. C.P.L.R. § 3012-a, who I reasonably believe is knowledgeable in the relevant issues involved in this actions, and I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action for medical malpractice against the Defendants.

Respectfully Submitted By:

/s Elmer Robert Keach, III

Dated: December 13, 2024

Elmer Robert Keach, III, Esquire
One Pine West Plaza, Suite 120
Albany, NY  12205
Telephone: 518.434.1718
Telecopier: 518.770.1558

Electronic Mail:
bobkeach@keachlawfirm.com

**ATTORNEY FOR PLAINTIFF**

E   HIBIT C



**ALLEN RILEY**
Chairman

**YOLANDA CANTY**
Commissioner

June 28, 2023

Sheriff Frederick Akshar
Broome County Sheriff's Office
155 Lt. Van Winkle Drive
Binghamton, NY 13905

RE: Branden Loori
DOD: 06/13/2022
FAC: Broome County Jail
MRB#: Special Investigation

Dear Sheriff Akshar:

Attached please find the final report in the matter of the death of the above captioned individual. This report has been approved by the Medical Review Board and the Commission of Correction. Please be advised that this report will become available to the public pursuant to New York's Freedom of Information Law on July 6, 2023.

You should be aware that some of the medical and/or mental health information contained herein may be prohibited by law from secondary dissemination. Therefore, you should check with your county attorney or other legal advisor prior to releasing any information contained in this report or its attachments, if any.

If you have any questions, please do not hesitate to contact our office at (518) 485-2346.

Sincerely,

Allen Riley
Chairman
Commission of Correction

Attachment



# Final Report of the
# New York State Commission of Correction:

## In the Matter of the Death of

## Branden Loori,
## an incarcerated individual of the
## Broome County Jail

## June 28, 2023

## To: Sheriff Frederick Akshar
## Broome County Sheriff's Office
## 155 Lt. Van Winkle Drive
## Binghamton, New York 13905

**Allen Riley**
*Chairman*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(e), regarding the care and treatment provided to Branden Loori which occurred while an incarcerated individual in the custody of the Broome County Sheriff at the Broome County Jail, the Commission has determined that the following final report be issued.

FINDINGS:

1.    Branden Loori was a 38-year-old male who died on 6/13/22 due to septic emboli to the lung from infective endocarditis following his release from the custody of the Broome County Sheriff at the Broome County Jail (CJ). The Medical Review Board has found that there was a failure by medical staff to perform adequate assessments and recognize clinical indicators that hospitalization was necessary. The Board opines that had Loori been properly assessed and timely transferred to a hospital for diagnosis and treatment, his death may have been prevented.

2.    Loori was born in Lakeland, Florida. Loori was survived by his child, parents, and three siblings. Loori finished high school and had a history of working in food service and construction. There was no further demographic or social history available to the Commission related to Loori.

3.    Loori had no significant medical history. Loori was prescribed Naproxen 500mg twice daily as needed for pain.

4.    Loori had a long history of substance abuse. Loori had no mental health history and was not prescribed any medications.

5.    Loori's first contact with the criminal justice system was in 2004 at the age of 20 after being arrested and charged with Unlawful Dealing With a Child 1st Degree. Loori pled guilty to the charge of Endangering the Welfare of a Child and was sentenced to 50 hours of Community Service. Loori had a total of two felony convictions for Criminal Possession Controlled Substance 3rd Degree and Criminal Possession Controlled Substance 5th Degree. Loori's sentences included probation and a license suspension. Loori had six misdemeanor convictions for Criminal Possession Controlled Substance 7th Degree, Criminal Possession of a Forged Instrument 3rd Degree, Operate Motor Vehicle With .08% of 1% Alcohol or More in Blood, and Endangering the Welfare of a Child. Loori's sentences included jail time, probation, and a license suspension. In the instant offense, on 9/29/20, Loori was arrested by the Binghamton City Police and charged with Criminal Possession of a Hypodermic Instrument and Criminal Possession of a Controlled Substance 7th Degree. Loori pled guilty to the charge of Criminal Possession Controlled Substance 7th Degree and was sentenced to three-years probation.

6.    On 5/18/22, Judge D.S. from the Binghamton City Court committed Loori to the custody of the Broome County Sheriff for a probation violation. Loori was remanded to the Broome CJ without bail.

7.    On 5/18/22 at 11:38 a.m., Loori was admitted to the Broome CJ by Correction Officer (CO) T.T. Loori scored a two on the Suicide Prevention Questionnaire after reporting that he had experienced a significant loss in the past six months and having a history of

drug or alcohol abuse. Loori reported using heroin and methamphetamine. Documentation indicated that Loori did not appear to be under the influence at the time of his admission to the jail. Documentation indicated that Loori's appearance was dirty and disheveled, but Loori was able to answer questions appropriately and he was cooperative with the officers. At 11:50 a.m., Loori was housed in Intake cell #5.

8.  On 5/18/22 at 4:07 p.m., Loori was transferred from Intake cell #5 to Medical Housing cell #3.

9.  On 5/18/22 at 4:11 p.m., Registered Nurse (RN) S.C. documented seeing Loori for his intake assessment. Loori's vital signs were documented as a temperature of 99.5, a pulse of 91, respirations of 16, a blood pressure of 113/71, and an oxygen saturation of 97%. Loori's weight was documented as 135 pounds and his blood glucose reading was 128. RN S.C. documented that Loori's lungs were clear with normal excursion and his heart rate and rhythm were regular. Loori's urine drug screen results were positive for Amphetamine, Fentanyl, and Methamphetamine. Loori scored a two on the Suicide Prevention Screening Guidelines for reporting that he had a history of drug or alcohol abuse and that he had experienced a significant loss within the past six months. Documentation indicated that Loori's appearance was appropriate, and his only complaint was chest pain. RN S.C. documented that Loori was being housed in medical housing for further cardiac evaluation. Loori was referred to see the facility's medical provider.

10. On 5/18/22 at 4:25 p.m., RN S.C. documented observing Loori sleeping on his cot half rolled up and lying face down. Loori reported having some chest discomfort and that laying in that position seemed to help him. Loori reported that his chest discomfort radiated to his back and that the pain had started around 8:00 a.m. that morning. RN S.C documented that Loori was slightly diaphoretic. Loori denied having any nausea, vomiting, or shortness of breath.

11. On 5/18/22 at 4:30 p.m., Physician Assistant (PA) S.R. documented seeing Loori in medical housing for complaints of chest pain. PA S.R. documented that Loori's vital signs were obtained by the booking RN 20 minutes prior to the assessment. Documentation indicated that Loori was alert, oriented, and laying comfortably on the mattress. Loori was able to sit up on his own. Documentation indicated that Loori's skin was normal in color with no ashen tone and was warm and dry with no diaphoresis. Documentation indicated that Loori's heart had a regular rhythm and rate with no murmur, rubs, or gallops. Loori's lungs were documented as being clear bilaterally. Loori reported that his chest pain radiated from his back to his front and that the pain was worse with deep breaths and that he had shortness of breath. PA S.R. documented that Loori had no history of chest pain or similar symptoms. Documentation indicated that Loori reported to PA S.R. that his sister had died three weeks prior due to endocarditis complications. PA S.R. documented, "likely due to anxiety of intake today, current legal situation, recent substance use, and recent death of sister. Provided stat dose of Hydroxyzine 50mg, Benadryl 25mg, and Pepcid 20mg". Documentation indicated that Loori would be monitored for worsening signs and symptoms, and he would remain on medications for detox with a follow-up on the following day. During an interview with Commission staff, PA S.R. reported seeing Loori due to his placement in medical housing for complaints of chest pain. PA S.R. reported that Loori looked pale and although not acutely ill, Loori looked chronically malnourished. PA S.R. reported that Loori had reported intravenous (IV) drug use and that his sister had passed away in the

previous month due to complications of endocarditis. PA S.R. reported not recalling if Loori was asked if him and his sister had used substances together. PA S.R. reported that Loori described his chest pain as a diffuse anterior chest wall pain that had developed that morning that radiated from his back to the front of his torso and that the pain was worse with deep breaths. PA S.R. reported that on Loori's physical exam, she did not hear any murmurs or abnormalities with Loori's lung sounds and that Loori's pain was reproducible with palpation to the anterior chest wall. During an interview with Commission staff, PA S.R. was asked if any of Loori's symptoms were consistent of a pulmonary emboli (PE). PA S.R. reported "Yes" that shortness of breath and chest pain were both symptoms of a PE, but Loori was not exhibiting any signs of a PE at that time. The Medical Review Board opines that Loori exhibited clear signs of an acute illness, consistent with a possible PE and/or acute coronary syndrome and should have been immediately sent to the hospital for an evaluation at that time.

12.    On 5/19/22 at 3:12 a.m., RN J.P. documented seeing Loori for a medical observation. Loori's vital signs were documented as a temperature of 98.4, a pulse of 95, respirations of 18, a blood pressure of 128/80, an oxygen saturation of 98%, and his pain scale was a 10 out of 10. Documentation indicated that Loori's respiratory rate was even, non-labored, and that his lung sounds were clear. RN J.P. documented that Loori presented with agitation due to having back pain from the bed he was laying on. Documentation indicated that Loori had no complaints of shortness of breath, chest pain, nausea, vomiting, dizziness, or cough, and that Loori was in no acute distress. RN J.P. documented that Loori was alert and oriented, agitated, and that he requested Icy Hot for his back pain. Loori was offered Tylenol for his back pain and reported, "That's not going to work". Loori accepted the Tylenol and was later observed by RN J.P to be resting in his bed. The Medical Review Board finds that there was a failure by RN J.P. to address Loori's unresolved complaints of acute 10 on 10 back pain and failed to consult with the jail physician.

13.    On 5/19/22 at 8:00 a.m., RN N.B. documented in the Clinical Opiate Withdrawal Scale (COWS) flow sheet that Loori scored a two on the assessment for a pulse rate of 87.

14.    On 5/19/22 at 10:25 a.m., RN N.B. documented seeing Loori for a medical observation. Loori's vital signs were documented as a temperature of 97.8, a pulse of 87, respirations of 18, a blood pressure of 90/72 lying/sitting, 100/76 standing, an oxygen saturation of 97%, and his pain scale was a 0 out of 10. Documentation indicated that Loori's respiratory rate was even and non-labored. RN N.B. documented observing Loori resting in bed comfortably and that he was able to come to the cell door for his assessment. Documentation indicated that Loori's only complaint was having upper back pain. RN N.B. documented that Ibuprofen was ordered per the pain protocol. Loori was encouraged to summon medical staff if his condition worsened.

15.    On 5/19/22 at 8:00 p.m., RN R.B. documented in the COWS flow sheet that Loori scored a one on the assessment for a pulse rate of 88.

16.    On 5/19/22 at 10:05 p.m., RN R.B. documented seeing Loori for a medical observation. Loori's vital signs were documented as a temperature of 98.5, a pulse of 88, respirations of 16, a blood pressure of 118/78 lying/sitting, 112/71 standing, an oxygen saturation of 96%, and his pain scale was a 0 out of 10. Documentation indicated that Loori's respiratory rate was even and non-labored. RN R.B. documented that Loori voiced no complaints other than back pain and neck pain that started earlier that day. RN R.B.

documented that Loori denied having any nausea, vomiting, or diarrhea. Loori's speech was clear, and his gait was steady. Documentation indicated that Loori did not appear to be in any acute distress.

17.    On 5/20/22 at 3:41 a.m., RN R.B. documented being called to speak to Loori regarding his pain. RN R.B. documented observing Loori laying on the concrete floor of his cell and that Loori sat up without apparent difficulty. Loori had complaints of right shoulder pain and he reported that he had not been able to sleep for the past three hours related to the pain. RN R.B. suggested to Loori that he may be more comfortable on the mattress rather that the cold floor. Documentation indicated that Loori was encouraged to speak to the medical provider about his pain on rounds in the morning. The Medical Review Board finds that a complete medical assessment was not appropriately performed on Loori's complaints of right shoulder pain that had enabled his sleep for three hours nor was Loori referred to the jail's physician for the continued complaints.

18.    On 5/20/22 at 8:00 a.m., RN N.B. documented in the COWS flow sheet that Loori scored a two on the assessment for a pulse rate of 106.

19.    On 5/20/22 at 12:14 p.m., Nurse Practitioner (NP) R.G. documented seeing Loori in medical housing for right shoulder pain. NP R.G. documented that Loori had arrived at the jail on the 18th and Loori reported that he hadn't used drugs in 3-4 days. NP R.G. documented that, "Loori had right shoulder pain but unsure why. No injury, fall, or trauma. Lungs non-labored, moved all extremities equally except for right shoulder which has decreased range of motion, pain with movement and palpation in the shoulder joint". Loori presented as alert, oriented, calm, and cooperative. NP R.G. medically cleared Loori from medical housing to regular housing. NP R.G. ordered Naproxen for pain and to have an x-ray the following week to evaluate the shoulder. During an interview with the Commission staff, NP R.G. reported seeing Loori on rounds for opiate use. NP R.G. reported that a review of the Incarcerated Individual's (II) chart was not done prior to seeing the II on rounds, and that a nurse will round with him and tell him why the II is in Medica Housing, and what the II's vital signs and COWS score was that morning. When NP R.G. was asked if he was aware that Loori had complaints of chest pain since his admission, NP R.G. reported, "He didn't complain of it to me so according to my note then he didn't have chest pain". The Medical Review Board finds that NP R.G. failed to review Loori's medical history prior to seeing Loori on rounds. The Medical Review Board finds that NP R.G. failed to get a full medical history report on Loori from the RN that did rounds with him on Loori, who was placed in Medical Housing for complaints of chest pain since his admission and detox.

20.    On 5/20/22 at 1:08 p.m., Loori was transferred from Medical Housing cell #3 to General Population F Block cell #107. At 2:00 p.m., Loori was moved from F Block cell #107 to F Block cell #129.

21.    On 5/20/22 at 4:55 p.m., RN N.B. documented seeing Loori for a medical observation. Loori's vital signs were documented as a temperature of 97.1, a pulse of 106, respirations of 16, a blood pressure of 128/80, an oxygen saturation of 96%, and his pain scale was a 0 out of 10. Documentation indicated that Loori was alert and cooperative with even and non-labored breathing. RN N.B. documented observing Loori laying in bed comfortably. Loori was able to go to the door for his assessment and he did not report any discomfort or distress. Documentation indicated that Loori refused to have a second set of vital signs done. The Refusal of Treatment form was signed by two RN

witnesses.

22.     On 5/20/22 at 8:00 p.m., RN R.B. documented in the COWS flow sheet that Loori refused the COWS assessment.

23.     On 5/20/22 at 11:20 p.m., RN R.B. documented that Loori refused to come to the medical treatment room for his detox assessment. The Refusal of Treatment form was signed by two RN witnesses.

24.     On 5/21/22, there was no documentation on the COWS flow sheet that Loori was seen by medical for his COWS assessment.

25.     On 5/21/22 at 10:50 p.m., RN R.B.  documented on the Refusal of Treatment form that Loori refused to come to the medical treatment room for his detox assessment. The Refusal of Treatment form was signed by two RN witnesses.

26.     On 5/22/22 at 8:00 a.m., RN P.L.W. documented in the COWS flow sheet that Loori scored a zero on the assessment.

27.     On 5/22/22 at 8:00 p.m., RN R.B. documented in the COWS flow sheet that Loori scored a four on the assessment for a pulse rate of 122.

28.     On 5/22/22 at 8:50 p.m., Loori was transferred from F Block cell #129 to Medical Housing cell #13.

29.     On 5/22/22 at 9:30 p.m., RN R.B. documented seeing Loori for his detox assessment. Loori's vital signs were documented as a temperature of 100.5, a pulse of 122, respirations of 20, a blood pressure of 86/51, an oxygen saturation of 95%, and a pain level of 4 out of 10. RN R.B. asked Loori to point to the shoulder pain he was having. Documentation indicated that Loori pointed to the center of his chest and reported that the pain went through to his back and to his right shoulder. Loori denied having a cough or shortness of breath. RN R.B. documented that Loori had slight inspiratory wheezes in all lung fields and louder at the bases. RN R.B. had Loori transferred from general population back to Medical Housing for closer medical observation. An Electrocardiogram (EKG) was obtained with results of sinus tachycardia with occasional ventricular premature complexes. RN R.B. contacted PrimeCare medical and spoke with on-call PA J.M. Documentation indicated that PA J.M. was updated to Loori's vital signs, symptoms, assessment findings, and the EKG results. RN R.B. documented that PA J.M. requested a chest x-ray to be ordered and for Loori to be seen by the medical provider in the morning. During an interview with Commission staff, RN R.B. reported that Loori did not look well and that he had complaints of chest pain that was going to his right shoulder. RN R.B. reported "being on the fence" as to sending Loori to the emergency room (ER) or to call the on-call PA. RN R.B. reported making the decision to call the on-call PA J.M. RN R.B. reported that she spoke with the on-call PA J.M. and reviewed Loori's complaints of shoulder pain for the past few days, refusing detox checks, Loori's vital signs, the EKG results, and that Loori had wheezing with his respirations. RN R.B. reported that PA J.M. ordered for Loori to have a chest x-ray in the morning and to make sure that the doctor saw him in the morning. RN R.B. reported that the officers in Medical Housing did not call for medical to come and assess Loori at any time during the night. When RN R.B was asked if she had returned at any time during the night to check on Loori, RN R.B. responded, "I did not". RN R.B. reported, "Typically

the officers that go around on the unit every 15-minutes will let medical know if somebody needs help or if an incarcerated individual requested to see the nurse". RN R.B reported that she gave a report to the oncoming day shift RN to see Loori first and to take his vital signs to see if he needed to go to the hospital prior to Dr. M.A. coming to the facility. The Medical Review Board opines that there was a complete failure by the medical staff to properly assess and provide treatment for a gravely ill individual.  The Medical Review Board finds that RN R.B. should have had Loori, who had hallmark signs of a worsening condition since his admission with a temperature of 100.5, a pulse of 122, respirations of 20, a blood pressure of 86/51, an oxygen saturation of 95%, with pain that radiated from his back to his right shoulder, transported immediately to the hospital for an evaluation at that time. The Medical Review Board also finds that RN R.B. should have minimally gone back and assessed Loori again throughout her shift and obtained another set of vital signs instead of telling the next shift nurse to check on Loori and to get a set of vital signs on him.

30.     During an interview with Commission staff, PA J.M. reported being on-call for Prime Care Medical on the night of 5/22/22. PA J.M. reported not having access to Broome CJ's computer medical records when she is on-call. PA J.M. reported that she did not recall getting a phone call from the Broome County Jail nurse on 5/22/22 in regard to Loori. PA J.M. reported not recalling getting the call and the particular patient. PA J.M. reported, "Typically if I received a call for a patient with those vital signs and complaints, I would have absolutely sent him to the emergency room". When PA J.M. was asked if there was anywhere that she documents the time and dates that she answers an on-call phone call when she is on call and PA J.M. stated, "No". PA J.M. was asked if there was anywhere that she documented notes if she received an on-call phone call and PA J.M. stated, "No". The Medical Review Board finds that Prime Care Medical does not have an adequate policy in place for on-call providers to document a date, time, and synopsis of what occurs when they receive an on-call phone call from the Broome County Jail medical staff.

31.     On 5/23/22 at 1:10 p.m., RN N.B. documented seeing Loori for a medical observation. Loori's vital signs were documented as a temperature of 97.2, a pulse of 98 sitting - 102 standing, respirations of 18, a blood pressure of 92/58 sitting - 86/54 standing, an oxygen saturation of 99% sitting - 96% standing, and his pain scale was a 6 out of 10. Loori reported having pain that radiated from his upper sternum/chest area to his right arm. Documentation indicated that Loori was alert, cooperative with even and non-labored breathing and that he was resting comfortably in bed. RN N.B. documented that Loori was able to go to the door for his assessment and that he was administered pain medication. Loori was encouraged to summon medical staff if his condition worsened.

32.     On 5/23/22 at 4:46 P.M., Dr. M.A. documented seeing Loori in the medical unit for having complaints of chest pain since the night prior. Documentation indicated that Loori's pain was consistent and radiating to his neck. Dr. M.A. documented that Loori's lungs were clear, and his cardiac assessment was a regular rhythm and rate. Dr. M.A. ordered for Loori to be transported to the hospital for an evaluation of chest pain and to rule out acute cardiac symptoms. The Medical Review Board opines that there was an unacceptable delay of over 48 hours in obtaining hospital level care for Loori and his documented worsening condition. Had Loori been timely sent to a hospital for diagnosis and treatment, his death could have been prevented.

33.    On 5/23/22, Loori was admitted to UHS Wilson Memorial Hospital for a septic embolism and respiratory failure. Documentation from the UHS Wilson Memorial Hospital discharge summary indicated that Loori was admitted for acute hypoxemic respiratory failure secondary to septic shock in the setting of Methicillin-resistant Staphylococcus aureus (MRSA) bacteremia and tricuspid endocarditis. Documentation indicated that on admission, Loori was tachycardic with complaints of chest pain, central, sharp, that radiated to his back and right shoulder, associated with shortness of breath, exacerbated by deep breathing. Loori also had complaints of decreased urinary output. A computerized tomography (CT) of the chest was ordered with results that were consistent with diffuse bilateral interstitial opacities consistent with septic emboli, as Loori had a history of intravenous (IV) drug abuse. Loori was started on IV vancomycin and cefepime. Blood cultures that were drawn on 5/23/22 with results consistent with MRSA. A transthoracic echocardiogram was ordered on 5/24/22 with results consistent with preserved ejection fraction but echogenicity and tricuspid valve consistent with vegetation.

34.    On 5/26/22, Loori's condition worsened, and a rapid response was called. Loori was found to be hypoxic with worsening mentation. Loori was intubated and started on mechanical ventilation. Loori was admitted to the intensive care unit (ICU) and his condition continued to deteriorate.

35.    On 5/26/22 at 9:58 p.m., Binghamton City Judge C.C. signed a release from the Broome County Sheriff's custody for Loori.

36.    On 6/13/22, the palliative care team met with Loori's mother to discuss Loori's prognosis. Loori's mother gave permission for a Do Not Resuscitate (DNR) and a Do Not Intubate (DNI), including a terminal wean and extubation on Loori. Loori died on 6/13/22 at 2:24 p.m. several minutes after extubation.


ACTIONS REQUIRED:

TO THE BROOME COUNTY JAIL PHYSICIAN AND MEDICAL DIRECTOR OF PRIME CARE MEDICAL:

1.    The Jail Physician shall conduct a comprehensive quality assurance review regarding the following:

    a.    On 5/18/22 at 4:30 p.m., why PA S.R. failed to send Loori to the hospital for an evaluation with his history of IV drug use, complaints of chest pain that radiated from his back to his front, and pain that was worse with deep breaths along with complaints of shortness of breath.
    b.    On 5/20/22/at 3:41 a.m., why RN R.B. did not perform a complete medical assessment on Loori who had complaints of right shoulder pain that had interrupted his sleep for three hours.
    c.    On 5/20/22 at 12:14 p.m., why NP R.G. did not review Loori's medical history prior to seeing Loori on rounds.
    d.    On 5/21/22, why there was no documentation on the COWS flow sheet for Loori.
    e.    On 5/22/22 at 9:30 p.m., why RN R.B. did not have Loori transported to the hospital for an evaluation for a temperature of 100.5, a pulse of 122, respirations of 20, a blood pressure of 86/51, an oxygen saturation of 95%, and a pain level of 4 out of 10

for chest pain in the center of his chest that went through to his back and to his right shoulder.

2.  The Medical Director shall review the lack of documentation regarding the recording of on-call date and times of correspondence with the facility, along with documentation of reported clinical findings and orders given to the facility caller.

A report of findings and corrective actions taken shall be provided to the Medical Review Board upon completion.

*In a response received 5/1/23 to the Commission's preliminary report, the Chief Medical Officer of PrimeCare Medical of NY, Inc. indicated that the requested reviews were completed and that there was no casual relationship between the care provided to Loori and his deteriorating condition three days into being hospitalized and then subsequent death. The Commission's Medical Review Board remains affirmed in its opinion that the assessments by medical staff were deficient and that a timely transfer to a hospital for diagnosis and treatment could have been prevented Loori's death.*

TO THE CHAIR OF THE BROOME COUNTY LEGISLATURE:

As the appointing authority for the delivery of jail incarcerated individual health services pursuant to Correction Law section 501, the County Legislature shall review the above findings and conduct an inquiry into the fitness of the currently designated provider.

WITNESS, HONORABLE ALLEN RILEY, Chairman, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 28th day of June, 2023.

Allen Riley
Chairman
Commission of Correction

AR:BB:jdb
Special Investigation
June 2023